The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below.  This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.



**Dated:  March 02 2010**

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.  09-35944 |
| | ) | |
| Ahmed A. Orra and | ) | Chapter 7 |
| Sueli A. Orra, | ) | |
| | ) | |
| Debtors. | ) | JUDGE MARY ANN WHIPPLE |

## MEMORANDUM OF OPINION AND ORDER

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 10] and Debtors' response [Doc. # 21].  The court held a  hearing on the motion that Debtors, their counsel and counsel for the UST attended in person and at which the parties presented testimony and other evidence in support of their respective positions. The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11.  It has been referred to this court by the district court under its  general order of reference.   28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio.  Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that this court may hear and determine.  28 U.S.C. § 157(b)(1), (b)(2)(J) and (O).

Having considered the briefs and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the court will grant the UST's motion and dismiss Debtors' Chapter 7 case

unless they convert it to Chapter 13.

**BACKGROUND**

Debtors are married and have one dependent child, a daughter aged 17. In all, eight people are currently living in their home – Debtors, their seventeen-year-old daughter, their twenty-five year old son, an adult daughter and her two children, who have lived with them since December 2008, and Sueli Orra's mother, who has lived with them since approximately 1985. Debtors' son graduated from college with a masters degree in 2008 and recently began working full time after obtaining a position as a counselor at a local private high school. Debtors' adult daughter does not work but has received some type of welfare support since mid-2008 and recently began receiving child support payments from her ex-husband. Sueli Orra's mother also does not work but does receive approximately $600 per month in Supplemental Security Income ("SSI") benefits. Debtors do not know how much either of their adult children earn or receive on a monthly basis.

Ahmed Orra is sixty-two years old and is employed at the Toledo North Assembly Plant of Chrysler Group LLC, where he has worked for twenty-five years. He was laid off from work for thirteen weeks during 2009 and no longer has the position of team leader. However, Mr. Orra anticipates fewer layoffs and more regular work given Chrysler's merger with Fiat and the resulting investments being made at the Toledo plant in order to make a new vehicle. Mr. Orra has no plans to retire in the next five years. Sueli Orra is fifty-two years old and has been employed at the post office for twenty years. During the past year she was off work on and off over a six month period due to a knee injury and a hernia surgery. Although she was paid in full to the extent that she had paid leave accumulated, her leave was insufficient to cover as many days as she had to take off. Mrs. Orra also has no plans to retire in the near future.

On August 28, 2009, Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code, stating that their debts are primarily consumer debts. Their bankruptcy schedules show no unsecured priority debt and total unsecured nonpriority debt in the amount of $182,240, which consists largely of credit card debt and includes many store cards (Dick's, JCPenney, Old Navy, Furniture Row, Kohl's, New York & Company, Sears, Victoria's Secret and The Avenue). Their Schedule D shows total secured debt in the amount of $272,825. Their secured debt includes $142,907 secured by a first mortgage and $70,600 secured by a second mortgage on Debtors' residence, which they value at $230,000, as well as mortgage debts of $30,167 and $29,151 that are secured by rental properties owned by Debtors and which they value at $34,800 and $31,100. Debtors' second mortgage on their residence was obtained in 2005 and was used to pay credit card debt. Likewise, the mortgages on the rental properties were obtained in 2006 and were also

2

used to pay credit card debt as well as paying off lines of credit secured by the rental properties.

At the time they filed their petition, Debtors stated an intention to reaffirm the mortgage debt not only on their residence but also on the two rental properties. They are current on their first and second mortgage payments on their residence. And they were current on their mortgage payments for the rental properties until August 2009 but have made no payments since that time. At the hearing, Mr. Orra stated an intention to surrender both properties. However, Mrs. Orra testified that Debtors are attempting to negotiate with the bank that holds all of their mortgages in order to lower their payments and that, if the bank gives them "a good deal," they will keep the rental properties.

Debtors' Schedule I shows gross monthly income of $8,247, which annualized is $98,964. While this is approximately the same as what they earned in 2008, it is a decrease of approximately $14,200 from what they earned in 2007, which is attributed to Mr. Orra being periodically laid off from work. Debtors' Schedule I shows net monthly income after payroll deductions in the amount of $6,478. Although Mrs. Orra also has $100 per bi-weekly pay period withheld as a contribution to the Thrift Savings Plan, a retirement savings plan for federal employees, as well as $278 each pay period to repay a Thrift Savings Plan loan obtained by her two to three years ago, these withdrawals are not reflected in the net income figure set forth on Debtors' Schedule I. The UST's bankruptcy analyst testified that the maximum repayment period for a Thrift Savings Plan loan is five years.

Also not included on their Schedule I is rental income in the amount of $675 that Debtors receive from one of their rental properties. Debtors were not receiving any rent with respect to this property for a six-month period that included August, the month they filed their petition, as a result of a city code inspection and repairs that were required to be made. However, repairs have been made and Debtors are currently receiving the rental income. According to Ahmed Orra, the second "rental" property owned by Debtors has not been rented for at least five years. He testified that during 2008, he was forced by the city of Toledo to make certain repairs or the houses would be demolished. He further testified that additional repairs still need to be done on both properties. Debtors' federal income tax returns reflect that rental repairs totaling $46,025 were made during 2008, which, according to Debtors, were paid for primarily with credit cards. The deductions on Debtors' income tax return for such repairs resulted in a $12,836 income tax refund for 2008, which amount was used to catch up payments on their mortgage and for further repairs on the rental property.

Debtors' Schedule J shows total monthly expenses of $8,873, resulting in a monthly shortfall of $2,394. Their expenses include, among other things, first and second mortgage payments with respect to

3

their residence totaling $3,200, mortgage payments for the two rental properties of $469 and $489, electricity and heat expenses of $540, a telephone/internet/cable expense of $190, cell phone expense of $199, food expense of $1,200, transportation expense of $600 plus $691 for "car upkeep/replacement," and a recreation expense of $100. Debtors testified that these expenses reflect the total expenses for their entire household, including other adult members of their household. For example, Debtors pay for a cell phone not only for themselves and minor daughter, but also for their adult son. Their $600 transportation expense includes gas for their adult son's car. Neither Sueli Orra's mother nor Debtors' oldest daughter contribute any funds to pay monthly household expenses. Although Debtors' son also does not contribute any regular amount towards the household expenses, since September when he started working, he occasionally buys groceries for the family.

Before filing their bankruptcy petition, Sueli Orra contacted each of Debtors' credit card creditors to explain their financial situation. She testified that some of the creditors were willing to work with her to lower their interest rates, and Debtors continued to make their minimum monthly payments on their credit cards until the time of filing their petition.

Debtors' Form B22A calculating the means test shows that their annualized current monthly income at the time of filing this case was $91,876, which is less than the median family income in Ohio for a family the size of Debtors' family. Therefore, no presumption of abuse arose under § 707(b)(2). The UST is proceeding on his timely filed motion to dismiss for abuse under § 707(b)(3) based on the totality of the circumstances.

**LAW AND ANALYSIS**

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Under § 707(b)(3), in determining whether granting relief would be an abuse, the court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). This provision was added by Congress in 2005 as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Compared to the "means test" measurement of abuse added by Congress at § 707(b)(2), analysis of the totality of the circumstances under § 707(b)(3) "offers a more subjective test that requires a case-by-case analysis of a debtor's financial situation and course of conduct to determine abuse." *In re Lamug*, 403 B.R. 47, 52 (Bankr. N.D. Cal. 2009); *In re Kaminski*, 387 B.R. 190, 194-95 (Bankr. N.D. Ohio 2008). In asserting that Debtors' case should be

4

dismissed under § 707(b)(3), the UST has the burden of proof by a preponderance of the evidence. *In re Pandi*, 407 B.R. 299, 301-02 (Bankr. S.D. Ohio 2009).

Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).

In this case, the UST does not argue that Debtors filed their petition in bad faith but instead contends that the totality of the circumstances show that Debtors are not needy and that they have the ability to repay a meaningful portion of their unsecured debt. A debtor is "needy" when "his financial predicament warrants the discharge of his debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge,* 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn*, 886 F.2d at 126.

In arguing that Debtors are not needy, the UST points to Debtors' joint annual income of nearly $99,000, their payment of expenses for adult members of their household who have support resources but do not contribute to paying such expenses, Sueli Orra's ongoing contribution to her retirement account and repayment of a loan from that account, their payment of mortgages on rental property that do not yield rental income, and a housing expense that is more than three times the Internal Revenue Service ("IRS") offer in compromise standards for such expense. The court agrees that under a totality of the circumstances analysis, Debtors are not needy.

The UST focuses first on Debtors' monthly housing expense. He uses a comparison between Debtors' monthly home mortgage expense and an IRS standard for housing expenses in Lucas County,

5

Ohio as the touchstone of unreasonableness indicative of abuse. UST bankruptcy analyst Catherine Lowman testified that Debtors' monthly mortgage payments on their home exceed three times the applicable IRS standard. The court generally agrees that a factor in the unreasonableness of a debtor's budget, and hence a factor indicative of abuse under the totality of the circumstances under § 707(b)(3), may be an excessive mortgage payment. *In re Crink*, 402 B.R. 159, 171 (Bankr. M.D.N.C. 2009). *But cf. In re Dumas*, 419 B.R. 704, 710-11 (Bankr. E.D. Tex. 2009)(court finds that it lacks discretion with above median income debtors to find abuse based on unreasonable mortgage costs of 36% of gross income because they are permitted by the means test). The court nevertheless finds the application of the IRS standards to which Lowman testified of minimal probity in this case, as it has in other cases. *See In re Seeburger*, 392 B.R. 735, 742-43 (Bankr. N.D. Ohio 2008)(noting that even in determining whether there is a presumption of abuse under § 707(b)(2), Congress did not limit a debtor's mortgage expense deduction to the applicable IRS standard); *In re Soncrant*, No. 08-31921, 2008 Bankr. LEXIS 4103, *13-15, 2008 WL 6191998, *5 (Bankr. N.D. Ohio Nov. 3, 2008).

The standards to which Lowman testified are used by IRS to evaluate offers in compromise of unpaid tax debts. Congress also adopted IRS standards to limit certain expenses in the objective "means test" of § 707(b)(2). But Debtors do not have unpaid tax debts and no foundation has been provided explaining how the IRS standards were developed, on what data they are based, or how current that data might be. So while the court understands the effort to provide objectivity to the subjective inquiry inherent in the totality of the circumstances test, there is really no evidentiary context to assess what it means in this case to have a monthly housing expense that is a multiple of the IRS standard. Rather, "in considering whether housing expenses are excessive, due regard should be given to the size of the family, their reasonable needs, and the costs of alternative housing. Furthermore, a court should not unduly depreciate a debtor's long-standing, traditional ties to a homestead." *In re Crink*, 402 B.R. at 171. In this case, the $230,000 value of, and total of $213,000 in liens against, the suburban Toledo residence that Debtors have lived in since 1995 and that houses from 4 to 8 people at various times is not indicative to the court of debtors who have inflated housing costs in an effort to live an indulgent lifestyle at the expense of unsecured creditors.

At the same time, the court is troubled that Debtors' first mortgage payment of $2,500 consumes nearly 39% of their monthly net income, and together their first and second home mortgage payments consume nearly 50% of their monthly net income. But the record does not show the court the terms of the debt and why the payments are so high given the relatively unremarkable overall amount of the debt

6

encumbering the property. The court infers from Mrs. Orra's testimony that it is a twenty-year mortgage (modification of which is being explored), which likely contributes to their imbalanced monthly mortgage payment amount. Based on this court's experience in Chapter 13 cases in particular, this level of monthly housing expense as a percentage of net monthly income has contributed to Debtors' overall financial difficulties. The court also agrees that a Chapter 7 discharge is not meant to be used as a means by which a debtor can perpetuate bad financial decisions. *In re Kaminski*, 387 B.R. at 196. On balance, however, the court finds that Debtors' intention to continue paying this housing debt if they can while discharging their unsecured creditors is not of itself abusive given the overall circumstances of Debtors' housing situation as they appear on the record (the value of the house, the long time they have lived there, the principal amount of the encumbrances, the number of people sheltered at various times, and that the second mortgage debt was used in part to pay down unsecured credit card debt). *See, e.g., Crink*, 402 B.R. at 171 and cases cited therein. *But see In re Kaminski*, 387 B.R. at 196 (monthly housing expense of $1,856.16 for family of four compared to IRS standard expense of $841.00 per month is excessive, unreasonable and a factor indicative of abuse).

Nevertheless, while the housing expense emphasized by the UST is not indicative of abuse in this case, the court does find that a preponderance of other factors support a conclusion of abuse based on the totality of the circumstances. In other respects, Debtors' budget does manifest a desire to maintain the standard of living that precipitated the bankruptcy filing and which unsecured creditors should not be called on to subsidize permanently. *See In re Shaw*, 310 B.R. 538, 541 (M.D.N.C. 2004); *In re Mooney*, 313 B.R. 709, 715 (Bankr. N.D. Ohio 2004).

The court agrees that Debtors continuing to pay a monthly mortgage expense of $958 on their two rental properties while discharging their credit card debt is unreasonable. The testimony of Mr. Orra and Mrs. Orra conflicted to some degree as to whether they intend to retain these properties and pay the related debts. The court finds that it is their intention to do so from Mrs. Orra's testimony. She is largely responsible for paying the family bills, and she testified that loan modification discussions are ongoing with the mortgagee on all three of their properties such that they will retain the rental properties if they get a good enough deal. Their statement of intention also indicates that they will retain the rental properties. One of the properties has not been rented for at least five years, yet Debtors expended $20,000 in 2008 for repairs on that property. While Debtors currently receive $675 per month in rental income from the second property, they expended over $26,000 for repairs on that property in 2008 and have indicated that more repairs are still necessary. Those repairs were paid for with credit cards. Debtors also received an income

7

tax refund for 2008 in the amount of $12,836, largely due to the deductions they received for the repair expenses that were paid for with credit cards, yet that refund was used to catch up payments on their mortgage expense and to complete additional repairs on the rental property rather than to pay the associated unsecured debt, which they now seek to discharge while retaining the repaired properties as an investment. The court is troubled by these facts and does not believe this to be fair treatment of unsecured creditors, who should not be required to permanently subsidize through a Chapter 7 discharge Debtors' continued ownership and maintenance of their investment rental properties.

The court also finds the total monthly expenses set forth on Debtors' Schedule J to be unreasonable apart from their secured debt expense. The magnitude of the expenses are due in large part to the fact that they are for all members of Debtors' household, notwithstanding the fact that three adult members thereof have independent sources of support that could help supplement Debtors' income for payment of these expenses. Debtors seemed genuinely surprised by the questions at trial that anybody would even think that their adult family members should be asked to contribute any part of their support resources to maintenance of the household that sustains them. While Debtors' ongoing generosity to their family is commendable, and based on the court's observation of them stems from an understandable pride and a deeply abiding sense of personal duty, it must give way to the rights of their unsecured creditors under these circumstances.

In addition, in assessing Debtors' ability to pay their unsecured debt, the court is not required to accept all of the expenses as stated in their schedules. Rather, in evaluating the totality of the circumstances of Debtors' financial situation, the court must consider whether living expenses can be reduced significantly without depriving Debtors or their dependents of adequate food, clothing, shelter, and other necessities. *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge*, 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn,* 886 F.2d at 126. "While bankruptcy relief is not conditioned upon a debtor living in poverty, it does envision a sacrifice on the part of the debtor." *In re Felske*, 385 B.R. 649, 656 (Bankr. N.D. Ohio 2008).

In this case, from a review of Debtors' expenses, it appears that little or no belt tightening has occurred. *See In re Ramlow*, 417 B.R. 479, 484 (Bankr. N.D. Ohio 2009) (identifying whether debtors have made an honest attempt to minimize their expenses through "good, old-fashioned belt tightening" as a consideration in assessing the existence of abuse under § 707(b) and citing *In re Krohn*, 886 F.2 123, 126-27 (6th Cir. 1989)); *In re Srikantia*, 417 B.R. 505, 513 (Bankr. N.D. Ohio 2009)(there is no set standard by which a court can decide if a budget is excessive, but a discharge requires a willingness to make some sacrifices). Some indication of this failure to minimize expenses is a $1,200 monthly food expense,

8

telephone/internet/cable expenses of nearly $400, and transportation and car maintenance expenses of $1,291, when Debtors are not required to drive far from home to their respective places of employment. The court understands that Debtors are driving older model vehicles. But this expense is excessive and can be reduced.

Debtors both enjoy long term and fairly stable employment. Although Ahmed Orra has been periodically laid off over the last couple of years, he anticipates less layoff time and more regular work going forward. And although Sueli Orra missed a fair amount of work due to health issues, there is no evidence that those issues are ongoing so as to continue to cause her to miss work. As Debtors with long term, regular, relatively stable income, they are eligible for adjustment of their debts through Chapter 13 since their debts are less than the statutory eligibility limits. *See* 11 U.S.C. §§ 109(e), 101(30). The court finds that if Debtors surrender their rental properties, engage in the belt-tightening required of a debtor in bankruptcy as discussed above and permit the adult members of their household to contribute to the household expenses, Debtors would have the ability to repay a meaningful portion of their unsecured debt without being deprived of adequate food, clothing, shelter and other necessities. This finding is reinforced by the fact that, although not included in their budget set forth in Schedules I and J, Sueli Orra has continued to be able to have $378 withheld from her pay every two weeks as Thrift Savings Plan contributions and loan repayments. The court is also troubled that the Thrift Savings Plan account and its value are not disclosed on Schedule B.

The availability of debtors' remedies under state law and the relief that might be afforded through private negotiations with creditors are other factors the Sixth Circuit has identified as relevant in deciding whether it would be an abuse to grant a Chapter 7 discharge in a particular case. There is some evidence that Debtors attempted to engage in private negotiations with their unsecured creditors. However, the limited success they had in doing so was insufficient in addressing their financial issues. The record is otherwise silent regarding this factor. As the United States Trustee bears the burden of proof on the motion, *In re Wright*, 364 B.R. 640, 643 (Bankr. N. D. Ohio 2007), the court will assume that there are no such state law remedies or private negotiations that will assist in resolving Debtors' financial problems.

Nevertheless, on balance, the court finds that granting Debtors relief under Chapter 7 of the Bankruptcy Code would be an abuse of the provisions of that chapter given the following financial circumstances: (1) Debtors both have stable, regular, substantial joint income from long term employment; (2) they are eligible for Chapter 13 relief if they choose to seek such relief; (3) they have the ability to reduce their expenses as stated on their Schedule J and to obtain contributions for expenses from adults

9

living in their household without depriving themselves or their dependents of any necessity; (4) they have the ability to repay a meaningful portion of their unsecured debt by reducing their secured debt; and (5) Debtors' unsecured creditors are being unfairly asked to permanently shoulder the burden of advancements they made to maintain investment rental properties in which Debtors intend to build equity.

**THEREFORE**, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Debtors are allowed twenty-eight (28) days from the date of this order to file a motion to convert to a Chapter 13 case, absent which the Motion of the United States Trustee to Dismiss for Abuse Pursuant to 11 U.S.C. § 707(b)(1) and (b)(3) [Doc. #10] will be granted, and this case will be dismissed, by separate order of the court.

10